IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| CARRIE MISTINA | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:13-cv-692 |
| | ) |
| ALEXANDRIA CAPITAL, LLC, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

THIS MATTER comes before the Court on the Parties' Cross Motions for Summary Judgment. There is no dispute of material facts, and this case is ripe for summary judgment.

In July 2011, Summit entered into an Asset Purchase Agreement ("APA") with Alexandria whereby Summit would sell a Client List and the investment accounts of those clients to Alexandria. The Client List was a list of seven Summit customers, for whom Summit managed investment funds held by Summit on those clients' behalf. The value of those seven client accounts was $16,675,419. Different clients had different fee structures by which Summit was paid for managing the accounts. Summit made its money from the fees collected from managing the accounts.

1

Under the APA, Summit transferred the client list and their respective investment accounts to Alexandria on the purchase date, August 1, 2011. Alexandria would pay Summit for that sale with a percentage of annual fees that Alexandria collected off those accounts over the next four years. Alexandria would bill those client accounts, keep two-thirds of the client fees for itself, and pay one-third of those fees for the next four years to Summit. After October 1, 2014, when Summit was to have been paid in full, Alexandria would keep the full value of the annual fees from then on.

Under the APA's terms, on August 1, 2011, Summit Wealth Management entered into an Agreement with Defendant Alexandria (then Botree Westmount Partners, LLC), wherein Summit transferred certain investment accounts that had been managed by Richard and Jill Potter ("Potter Accounts") to Alexandria in exchange for (a) a down payment of one-third of eight times the average fees generated from the Potter Accounts during the previous four quarterly billing cycles, beginning with the December 31, 2010, billing cycle that successfully transferred to the Purchaser ("Down Payment"); and (b) four subsequent payments of one-third of the annual fees generated by the Potter Accounts ("Annual Payments"), to be paid on October 1 in 2012, 2013, 2014, and 2015, respectively.

According to the spreadsheet provided by Alexandria CFO Charles D'Angelo (and cc'd to Alexandria CEO Augustine Hong), the estimated total annual fees collected would be $117,482. One third of that amount is the estimated fee due to Summit after the first year, $39,160.99. These were estimates, as the fees generated could vary based on market conditions.

Alexandria made an initial $40,000 installment of the Down Payment on August 4, 2011, and paid the remaining $32,511 of the Down Payment on October 17, 2011. Based on the fees previously generated by the Potter Accounts, the estimated total value of the Annual Payments was projected at the time to be between $130,000 and $225,000. On August 21, 2012, Summit sold that property—the right to the next four Annual Payments—to Ms. Mistina.

Alexandria confirmed in writing its acknowledgment of Summit's assignment of that property to Ms. Mistina the next day, August 22, 2012, and agreed that the Annual Payments would be made to her. As Alexandria explicitly recognized at the time, there was no need for it to sign off on Summit's assignment of its property, the Annual Payments, to Ms. Mistina, because Summit had the right to do that on its own.

Ms. Mistina addressed Alexandria and Summit directly to make sure there was no question that Alexandria recognized that the Annual Payments belonged to her, and that Alexandria recognized the payments were to be sent to her, not Summit. Alexandria made

plain its understanding at the time that the ownership of the property—the four Annual Payments—had been transferred from Summit to Ms. Mistina, and that Alexandria was to make the payments, once it possessed the funds, to Ms. Mistina. The first of Alexandria's Annual Payments was due on October 1, 2012. Alexandria did not make the first Annual Payment—to Ms. Mistina or Summit—and refused to provide Ms. Mistina with any information concerning the amount due to her. At no point did Alexandria ever indicate it had not received the full value of the client accounts it had purchased from Summit under the APA.

Ms. Mistina then filed this suit against Alexandria in June 2013. In light of the then-ongoing receivership litigation concerning Summit in the Northern District of Georgia that arguably covered the Note and payments due thereunder, Alexandria moved to stay the instant case. The Receiver in the Georgia case maintained that the Note's Annual Payments were a fraudulent conveyance that rightfully belonged to the Receivership Estate, not Ms. Mistina. Alexandria's stay motion made no assertion that it owned the Note's Annual Payments but instead maintained that Alexandria simply awaited the outcome of the Receivership to learn what should be done with the Note proceeds. Alexandria came to that conclusion after repeatedly asserting it agreed with the Receiver that the Note belonged to the receivership estate, not Ms. Mistina. Alexandria also made no claim that the Note was invalid. This case

4

was stayed by consent on July 24, 2013, pending the outcome of the receivership litigation in Georgia.

On September 21, 2017, the Receiver filed suit against Alexandria in the Northern District of Georgia, seeking the Annual Payments that were owed to Ms. Mistina, without notice to her, claiming the payments as property of the receivership estate. The Receiver and Alexandria then entered into a settlement, under which Alexandria would pay the Receivership Estate $77,000 (out of what the Receiver alleged were a total of $138,375 in Annual Payments), and Alexandria would keep for itself the remaining $61,375. They also sought a bar order preventing Ms. Mistina from enforcing her ownership rights to the Annual Payments. Via the Receiver, they presented this settlement proposal in November 2017 to the receivership Court.

When the Court notified Ms. Mistina of the proposed settlement, she objected. After more than a decade of litigation in the Northern District of Georgia, including two successful appeals to the Eleventh Circuit, Ms. Mistina prevailed. The Receiver's fraudulent conveyance claim to the Annual Payments was rejected by the Court of Appeals, as was the proposed settlement between the Receiver and Alexandria to divide the Note between them. In its October 17, 2023, Order implementing the Eleventh Circuit's remand, the District Court for the Northern District of Georgia, held, in relevant part that: (1) that Summit validly

5

assigned full ownership of the August 1, 2011 Note with Alexandria Capital to Mistina by written agreement on August 21, 2012; (2) that all ownership or other interest claims to the Note by the Summit Wealth, Inc. Receivership, or anyone acting on its behalf, including the Receiver, or the SEC, or by Alexandria Capital, are void and without basis in law or equity; and (3) that Mistina is the sole and full legal owner of the Note.

Both Parties have now filed these Motions for Summary Judgment. This Court finds that the Plaintiff's Motion should be granted because the doctrines of judicial and equitable estoppel, issue preclusion, and res judicata all bar Defendant from relitigating this case. Each will be dealt with in turn.

Summary judgment is required when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. While the Court views the facts and inferences drawn in the light most favorable to the nonmoving party, the party opposing the motion for summary judgment must put forth specific facts showing a genuine issue of material fact. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). The burden of the moving party may be discharged by simply pointing out "that there is an absence of evidence to support the nonmoving party's case." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).

First, the doctrines of judicial and equitable estoppel. The doctrine of judicial estoppel prohibits a party from taking inconsistent positions within a single action. Catgen, LLC v. Hunter Mill West, L.C., 2021 WL 2843856 at *2 (4th Cir. 2021). It is a doctrine of fair play designed to prevent a party from talking through both sides of his mouth in order to protect the integrity of the courts and the judicial process. Spartanburg Cnty. Sch. Dist. Seven v. U.S. Gypsum Co., 1988 WL 25275 at *3 (4th Cir. 1988). Acting on the assumption that there is only one truth about a given set of circumstances, the courts apply judicial estoppel to prevent a party from benefiting itself by maintaining mutually inconsistent positions regarding a particular situation. King v. Herbert J. Thomas Mem. Hosp., 159 F.3d 152, 196 (4th Cir. 1998).

Judicial estoppel typically has three elements: (1) the party to be estopped must be asserting a position that is factually incompatible with a position taken in a prior judicial or administrative proceeding; (2) the prior inconsistent position must have been accepted by the tribunal; and (3) the party to be estopped must have taken inconsistent positions intentionally for the purpose of gaining an unfair advantage. These three factors are not inflexible prerequisites or an exhaustive formula and additional considerations may inform the doctrine's application in specific factual contexts. United States v. Velasquez, 52 F.4th 133, 141 (4th Cir. 2022).

7

The related doctrine of equitable estoppel prevents a party from changing litigation position after another party has relied on that position to its prejudice. Spartanburg, 1988 WL 25275 at *3. To establish equitable estoppel, it is not necessary to show actual fraud, but only that the person to be estopped has misled another to his prejudice. Barry v. Donnelly, 781 F.2d 1040, 1042 (4th Cir. 1986). Absent a showing of fraud and deception, equitable estoppel's essential elements are only a representation, reliance, a change of position, and detriment.

Here, both doctrines bar Alexandria's change of position more than a decade after telling this Court it had no interest in the Note payments. At the time it made that representation, Alexandria was fully aware that Mr. Alleca had been arrested, and that Summit was a Ponzi scheme. The Client List and investment accounts that Alexandria purchased from Summit in August 2011 had been in Alexandria's possession for nearly two years when it made that representation in July 2013. This Court relied on Alexandria's representation, staying the matter so that the true owner could be determined in the Georgia receivership case. Ms. Mistina relied on that representation; had Alexandria asserted a claim of ownership to the Note in 2013 instead of disclaiming any such interest, Ms. Mistina would have impled Alexandria into its ownership litigation in the Georgia case as a third-party defendant, alongside the Receiver. Alexandria would have then been forced to make its claims

on the merits, and the Note's ownership would have been disposed of in that single litigation.

Alexandria's conduct since demonstrates it made the initial representation to obtain an unfair advantage to make the litigation prohibitively expensive and prevent Ms. Mistina from reclaiming her property. It first sought to divide the Note with the Receiver via a settlement in 2017 in the Georgia Receivership litigation, despite having told this Court it had no interest in the Note. Notably, this is contrary to Alexandria's new position that the Note is invalid. The Eleventh Circuit rejected that gambit, and the Northern District of Georgia issued a judgment holding Ms. Mistina to be the sole owner of the Note payments and explicitly denied that Alexandria had any such interest.

Rather than comply with that judicial finding, Alexandria refused to provide an accounting and pay over the funds, instead taking the newfound position that it owned the funds after all. Alexandria changed its position—again—despite none of the underlying facts having changed since its initial representation to this Court in 2013. In the meantime, Ms. Mistina incurred, and still incurs, over a decade's expense litigating the Note's ownership (whose value is less than $225,000) in the Northern District of Georgia, including two successful appeals to the Eleventh Circuit. That litigation would have included Alexandria as a named defendant had it asserted its ownership interest in

9

this Court in 2013 instead of claiming that either the Receiver or Ms. Mistina was the true owner.

Alexandria cannot now relitigate the Note's ownership, as that was determined to belong to Ms. Mistina by the Eleventh Circuit and the Northern District of Georgia. As Alexandria told this Court in 2013, it explicitly knew about the Georgia litigation to determine the Note's ownership but chose not to participate in that determination on the merits. Having made that informed choice, Alexandria is collaterally estopped from asking this Court to revisit what has already been decided with finality in Georgia and from raising for the first time that the Note is invalid.

Second, issue preclusion. Issue preclusion, or collateral estoppel, bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim. <u>Orr v. U.S. EPA</u>, 2024 WL 2872874280 at *1 (4th Cir. 2024). It applies when (1) the issue to be precluded was previously litigated; (2) the issue was actually determined in the prior proceeding; (3) determination of the issue was a necessary component of the prior judgment; (4) the prior judgment is final and valid; and (5) the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior proceeding. The linchpin of whether collateral estoppel applies in a subsequent action based on the

10

determinations in a prior action is whether a party had "a realistically full and fair opportunity to litigate" that issue. State of N.C. v. Charles Pfizer & Co., Inc., 537 F.2d 67, 73 (4th Cir. 1976). A party that is aware of the opportunity to fully and fairly litigate an issue but chooses not to, is bound by the determination in the proceeding on that issue. In re Microsoft Antitrust Lit., 355 F.3d 322, 326 (4th Cir. 2004). Whether issue preclusion applies is committed to the District Court's discretion. Dracos v. Hellenic Lines, Ltd., 762 F.2d 348, 352 (4th Cir. 1985).

Here, it is undisputed that Alexandria knew the Note's ownership was being determined in the Georgia receivership litigation; Alexandria itself brought that litigation to this Court's attention in its 2013 Motion to Stay this case precisely because the ownership was being determined in the Georgia case. Had Alexandria wished to make its own claim to the Note, it could have intervened in that litigation, just as Ms. Mistina did. Instead, Alexandria took the position in this Court that it believed the Receiver to be the Note's lawful owner. Indeed, Alexandria was so aware of the Georgia litigation that it entered into a proposed settlement agreement with the Receiver to divide the Note between them, an attempt the Eleventh Circuit rejected in 2020.

Even after that attempt to keep nearly half the Note for itself failed, Alexandria still did not join the Georgia litigation to press its claim, despite knowing full well that the Note's ownership would be determined in that case. The Georgia receivership litigation provided Alexandria with a full and fair opportunity to press any ownership claim to the Note it might have had. The result of that litigation, which is a final judgment, is that Ms. Mistina has been explicitly determined to be the sole owner of the Note, and Alexandria has been explicitly determined not to have any ownership interest in the Note. Again, throughout that entire litigation Alexandria made no claim that the Note was invalid. Nor did the receiver. Having freely chosen not to participate in that litigation on the merits, Alexandria is collaterally estopped from litigating the issue in this Court.

Alexandria entered into the November 17, 2016, proposed settlement agreement with the Receiver, under which the Receiver asked the District Court to approve a division of the Note, with $77,000 going to the Receivership and Alexandria keeping $61,375, as well as barring Ms. Mistina from further litigating her ownership interest. By entering into that agreement, and allowing the Receiver to litigate it on Alexandria's behalf in the District Court and the Court of Appeals, Alexandria was in privity with the Receiver, who was Alexandria's virtual representative for purposes of determining the Note's ownership. Under collateral estoppel,

12

that privity precludes Alexandria from relitigating the case the Receiver lost on Alexandria's behalf.

Third, the doctrine of res judicata. Once a party has had a full and fair opportunity to litigate a claim, the party is precluded, under the doctrine of res judicata, from relitigating it. Duckett v. Fuller, 819 F.3d 740, 744 (4th Cir. 2016). The doctrine has several justifications, including that precluding parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation that comes from multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions. Res judicata (or claim preclusion) bars a suit in light of a prior judgment when three elements are demonstrated: (1) that the prior judgment was final and on the merits, and rendered by a court of competent jurisdiction in accordance with the requirements of due process; (2) that the parties are identical, or in privity, in the two actions; and (3) that the claims in the second matter are based upon the same cause of action involved in the earlier proceeding— i.e., the claims arise out of the same transaction or series of transactions, or the same core of operative facts. Likewise, privity can bind a party pursuant to collateral estoppel. In re Duncan, 448 F.3d 725, 728 (4th Cir. 2006).

The test for privity is whether the interests of one party are so identified with the interests of another that representation by one party is representation of the other's legal right. Weinberger v. Tucker, 510 F.3d 486, 491 (4th Cir. 2007). There is no single fixed definition of privity for purposes of res judicata. Whether privity exists is determined on a case by case examination of the relationship and interests of the parties. The touchstone of privity for purposes of res judicata is that a party's interest is so identical with another that representation by one party is representation of the other's legal right.

In the Northern District of Georgia case, Alexandria knew that Ms. Mistina sought to establish ownership over the Note, knew that the Receiver opposed her claim and sought ownership of the Note for the Receivership, and entered into the proposed settlement agreement for the express purpose of negating Ms. Mistina's claim and keeping for itself $61,375 of the Note's claimed total value of $138,375. Alexandria did not itself advocate for the settlement agreement's approval and against Ms. Mistina's claim. Instead, it allowed the Receiver to make the arguments on their mutual behalf in the District Court and the Court of Appeals, twice. At no time did the Receiver or Alexandria claim the Note was invalid. That endeavor failed, with the final judgment declaring Ms. Mistina to be the Note's sole owner. Alexandria was in privity with the

Receiver for purposes of determining the Note's ownership and is thus bound by the adverse judgment the Receiver obtained.

For the forgoing reasons, Plaintiff Carrie Mistina's Motion for Summary Judgment should be Granted; AND

Defendant Alexandria Capital, LLC's Motion for Summary Judgment should Denied.

An appropriate Order shall issue.

/s/ Claude M. Hilton
CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
June 5, 2025

15